UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PAMELA MILLER,**

       **Plaintiff,**

-v-                                                                             Case No.: 2:15-cv-179
                                                                                 JUDGE GEORGE C. SMITH
                                                                                  Magistrate Judge Deavers

**FRANKLIN COUNTY**
**CHILDREN SERVICES,** *et al.***,**

       **Defendants.**

**OPINION AND ORDER**

This matter is before the Court on Defendants Franklin County Children Services, Anthony Reams, and Morgan Hood's Motion to Dismiss (Doc. 10). Plaintiff has responded (Doc. 12) and Defendants have replied (Doc. 13). This motion is now ripe for review. For the reasons that follow, Defendants' Motion is **GRANTED**.

       **I.**    **BACKGROUND**

Plaintiff, Pamela Miller, moved to Franklin County, Ohio in 2005 to attend law school at The Ohio State University. Defendant Franklin County Children Services ("FCCS") is a public agency under the Ohio Department of Human Services, which is charged with the safety and welfare of all children in Franklin County. Defendant Anthony Reams was employed as a caseworker with FCCS. Defendant Morgan Hood is also employed by FCCS.

During Plaintiff's first year of law school she became active in the College of Law's "Justice for Children Clinic," which is an academic and clinical program that teaches law students relevant legal doctrines, and how to manage the ethical and strategic issues in

representing clients who are children.  Plaintiff started working with FCCS after Helen Wiley, an FCCS social worker, came to the law school to recruit volunteers to work with foster children.  Plaintiff completed the necessary background checks, and a basic training course, and was assigned to work with Chelsia Coons, a nine-year-old girl who lived with her little brother, Charlie, six years old, along with their maternal grandparents, John and Pat Sullivan.  Upon information and belief, a judge with the Franklin County Domestic Court ordered the children taken away from their biological mother, Kristina Pamonicutt, because of a storied history of abuse and neglect.

From October through December 2005, Plaintiff visited Chelsia once or twice a week and took her to various outings and activities.  Chelsia's little brother, Charlie, began to express his desire to have someone like Plaintiff to spend time with him.  Plaintiff suggested to Ms. Wiley that her boyfriend Brandon Parker could spend time with Charlie.  Brandon attended medical school in Cincinnati.  Mr. and Mrs. Sullivan appreciated having Plaintiff and Brandon in their grandchildren's lives.

On December 31, 2005, Mr. Sullivan, suffered a massive heart attack and died.  Following the funeral, Ms. Wiley told Plaintiff that she should try to spend more time with Chelsia than before and she began visiting three to four days per week.  Plaintiff also spent time with Charlie because Brandon was out of the country volunteering for Doctors Without Borders.  Plaintiff observed that the children were being neglected and unsupervised most of the time.  The children were wearing dirty clothing and not eating properly.   Plaintiff also observed that the house was in a "despicable state; there were cat & dog feces throughout the house, the children's clothes and shoes were soaked in cat urine, and there were cockroaches everywhere.  Also

throughout the house were mice–both living and dead–and Charlie had marks on him that he said were 'from where the mice crawl on me and bite me in my room.'"  (Doc. 1, Compl. ¶ 19).

Plaintiff ultimately confronted Mrs. Sullivan, who admitted that she couldn't control the children or "keep after things," and that the children were not regularly attending school because there was no bus to take them and since their grandfather died, there was nobody to walk them to school.  (Doc. 1, Compl. ¶ 20).  Plaintiff also observed that Chelsia was developing behavioral problems and was abusing Charlie, including hitting him, biting him, and scratching him in the face.  Based on these observations, Plaintiff began taking the whole family to weekly therapy appointments at Rosemont Center in January 2006.  She reported her concerns to the caseworker at Rosemont, to FCCS, and to her professor, Angie Lloyd, who was Chelsia's guardian ad litem in her family court proceeding.

The next month, Jodi Kauble from Rosemont called Plaintiff to ask her if she would agree to be paid by Rosemont to visit the children at their home five days a week, for an hour each morning, to supervise that they shower, wear clean clothes and get to school on time.  Before accepting the offer, Plaintiff first consulted her professor Ms. Lloyd and Ms. Wiley with FCCS to confirm that there were no conflicts of interest in doing so.  In March, April, and May of 2006, Plaintiff supervised the children five mornings every week and drove them to school.  She also continued to visit on evenings and weekends as she had been doing since January 2006.

During this time frame, Mrs. Sullivan was hospitalized several times due to complications with her diabetes, breathing troubles, and chest pains.  When she was hospitalized, the children stayed with Plaintiff at her Ohio State campus apartment.  Also, during this timeframe, when Chelsia got in trouble at school, the school principal would call Plaintiff after

he was unable to reach Mrs. Sullivan.  Plaintiff had to drop everything, including skipping or leaving her law school class, to go to the Sullivan home and speak to her.  Mrs. Sullivan would tell Plaintiff that she was too ill to leave the house and asked Plaintiff to report to the school on her behalf.  Plaintiff also attended the children's school events.  By June 2006, Plaintiff was providing 90% of the children's supervision and care outside of school hours.  Chelsia even started telling people that Plaintiff was her "adopted mom." (Doc. 1, Compl. ¶ 38).  Plaintiff continued to inform both her professor Ms. Lloyd and Ms. Wiley with FCCS how much time she was spending with the family.

Plaintiff also found a new home for the family to move into that was clean and rodent free.  She assisted financially and also sought out donations from family and friends for new furniture and household items.

At some point in the next couple of months, Mrs. Sullivan told Plaintiff that "Krissy" stopped by to visit the kids.  "Krissy" was Kristina Pamonicutt, the children's mother.  Plaintiff informed FCCS and Rosemont that both Krissy and her boyfriend Don, allegedly a convicted rapist, were around the children.  Plaintiff was concerned that Chelsia's behavior worsened after her mother's visit.  (Doc. 1, Compl. ¶¶ 47-48).

Chelsia, confirming Plaintiff's concerns, attacked her little brother, held him down, and poured acetone in his eyes.  Plaintiff had to take Charlie to the emergency room.  FCCS took Chelsia away from Mrs. Sullivan as a result.  Mrs. Sullivan became very upset and accused Plaintiff of plotting to take the children away from her.  (Doc. 1, Compl. ¶ 49).  A few days later, Ms. Wiley with FCCS called Plaintiff to tell her that her supervisor decided that Plaintiff should no longer be involved with the children and that the agency was terminating her volunteer status.

4

(Doc. 1, Compl. ¶ 50). For the next two years, Plaintiff had no contact with the children. She transferred from Ohio State to the University of Cincinnati School of Law where she could pursue a dual degree in law and social work. (Doc. 1, Compl. ¶ 52).

In 2008, Plaintiff applied to take the Ohio bar examination. As part of her application, she was interviewed by a panel regarding her character and fitness. The panel confronted her about accusations allegedly made by Ms. Lloyd, that Plaintiff had acted inappropriately by becoming "overly involved" with the children and overreacting to Chelsia's behavior problems. The panel also told Plaintiff that a family court in Franklin County had issued a "no contact" order that prohibited Plaintiff from having any contact with the children. This was the first time Plaintiff was informed of any legal proceedings involving her. (Doc. 1, Compl. ¶¶ 54-55). Plaintiff hired an attorney and challenged the no contact order and it was ultimately vacated.

In 2009, Plaintiff graduated from the University of Cincinnati with the dual degrees. In May 2010, she accepted a social work job in Washington, D.C. Plaintiff didn't have any contact with the children until 2011 when she received a Facebook message from Krissy. She acknowledged that what Plaintiff did for the children was good and she wanted her back in their lives. Chelsia was in foster care and Charlie was permanently placed with Plaintiff's mother. FCCS ultimately gave custody of Chelsia back to Krissy. Beginning in September 2011, Krissy arranged for almost daily phone calls between Chelsia and Plaintiff. Krissy encouraged Plaintiff to visit Chelsia over Thanksgiving and again at Christmas.

Shortly after the 2011 holidays, Plaintiff received a call from Chelsia's former foster parent stating that she had received a letter from Children's Hospital informing her that Chelsia had been absent from her psychiatry sessions and her treatment would be terminated. Plaintiff

5

informed her that the letter should be forwarded to Krissy.  Krissy became irrate and emailed Plaintiff, accusing her of conspiring to take Chelsia away from her.  Plaintiff didn't have any contact with Chelsia for the next four months until she received a call from the former foster parent, who told her that Krissy was physically and emotionally abusing Chelsia.  Plaintiff told her to report this to FCCS.  Plaintiff was later notified by Chelsia's school principal that Chelsia was being taken into police custody, for her own safety, until FCCS could intervene.  Chelsia's caseworker, Anthony Reams, however, released Chelsia back to Krissy's care despite pleas from Chelsia, her former foster parent, the principal and the police officer.  (Doc. 1, Compl. ¶¶ 63-64).

      Chelsia then ran away and showed up at Plaintiff's house in Maryland.  Plaintiff received a call from the Westerville Police Department inquiring about Chelsia's whereabouts.  Plaintiff informed them that Chelsia ran away and showed up at her house.  Minutes later, local police forced entry into Plaintiff's house and handcuffed both her and Chelsia.  They were interrogated regarding a complaint filed by Krissy that Plaintiff had abducted Chelsia and put her into a child prostitution ring.   (Doc. 1, Compl. ¶¶ 66-67).  The next day, Plaintiff filed an emergency petition for temporary custody of Chelsia and the local family court judge awarded emergency custody of Chelsia to Plaintiff.  A couple weeks later, Anthony Reams called Plaintiff to inform her that he had an order from Franklin County family court requiring Plaintiff to return Chelsia to FCCS's custody.  FCCS then filed a petition with the court in Maryland and custody of Chelsia was again transferred to FCCS.

      Plaintiff's mother then applied to be a kinship placement for Chelsia since she already had her brother.  Plaintiff's mother completed the home study and passed.  But Reams told her that he was not going to recommend her because "there's no guarantee that you won't let Chelsia

6

see your daughter." (Doc. 1, Compl. ¶ 74). Reams explained that Plaintiff "harmed Chelsia by helping her run away and trying to get custody of her." (Doc. 1, Compl. ¶ 75).

Around the same time, Plaintiff received another call from Chelsia's former foster parent, informing her that Krissy made allegations to Nationwide Children's Hospital that both she and Plaintiff had sexually abused Chelsia. Plaintiff was questioned by an investigator with FCCS regarding these allegations. (Doc. 1, Compl. ¶¶ 76-77).

Plaintiff moved to Petaluma, California around August 2012, but continued to maintain phone contact with Chelsia. In January 2013, Plaintiff received a series of calls from Chelsia, who was apparently under the influence of drugs and alcohol and threatening to commit suicide. Plaintiff reported this to the Columbus Police, FCCS and Anthony Reams. Then, a few days later, Chelsia ran away from her foster home, but Plaintiff was not in contact with her. Then, a few weeks later, police in Petaluma went to Plaintiff's apartment and searched the premises without a warrant. (Doc. 1, Compl. ¶¶ 79–81).

On March 8, 2013, Defendant Reams filed a criminal complaint against Plaintiff in the Franklin County Court of Common Pleas, Division of Domestic Relations-Juvenile Branch, Case No. 2013-JU-03-03528, for allegedly violating Ohio Revised Code § 2913.23(B). Reams alleged that on January 31, 2013, Plaintiff violated a "no-contact" order in Case No.: 2000-JU-1100 by purchasing an airline ticket for Chelsia to fly from Columbus, Ohio to Baltimore, Maryland. A summons was delivered to Plaintiff's mother's house and Plaintiff's mother retained counsel for her daughter. A motion to dismiss was filed and the case was ultimately dismissed. (Doc. 1, Compl. ¶¶ 82-86). The same charges were again filed later that year and assigned Case No. 2013-JU-013995. Plaintiff's counsel again filed a motion to dismiss which

was ultimately granted. Two weeks later, on March 26, 2014, the same complaint was filed again and assigned Case No. 14-JU-004037. Again Plaintiff's counsel filed a motion to dismiss and the court held a hearing. There were statements made by counsel for FCCS that Plaintiff was mentally ill and a child abuser/molester. Plaintiff's motion was denied and her counsel filed an appeal which was dismissed because the order denying her motion to dismiss was not a final appealable order. (Doc. 1, Compl. ¶¶ 98–102). As of the filing of the Complaint in this case, the charges against Plaintiff in Franklin County remain pending. Additionally, there are still pending charges against Plaintiff in California for felony child abduction.

In April 2013, Chelsia called Plaintiff from Plaintiff's brother's house in Maryland and told her she was pregnant, using drugs and asked to come live with Plaintiff in California. Despite Plaintiff saying no, Chelsia flew to California in May 2013 to get help from Plaintiff. Plaintiff took her in temporarily and took Chelsia to a local health center for treatment and counseling. (Doc. 1, Compl. ¶¶ 87– 88).

In June 2013, after learning that the local police were looking for her, she took Chelsia to the police station. The police immediately took them both into custody and placed Plaintiff under arrest. Plaintiff was not informed why she was being detained. She was eventually taken to the county jail, where she was strip searched, and left naked in a small, empty cell with no toilet or sink for six hours. Plaintiff was treated for post-traumatic stress disorder ("PTSD") following this incident. (Compl. ¶¶ 89-91). Plaintiff eventually moved back home to Cincinnati, Ohio and accepted a position as a social worker with the Children's Home of Cincinnati. She was forced to resign this position on June 6, 2014, after one or more individuals with FCCS contacted her employer and told them she was a child molester/abuser, and that "child sex abuse

charges" were pending against her. (Doc. 1, Compl. ¶¶ 103-104).

Plaintiff alleges that her character and professional integrity have been irreparably harmed by Defendants' defamatory statements about her. She alleges that she continues to suffer from PTSD, and although Chelsia is now 18, she lives with fear and anxiety that FCCS will cause her to be falsely arrested or lose her job.

## II. STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, any pleading that states a claim for relief must contain a "short and plain statement of the claim" showing that the pleader is entitled to such relief. Fed. R. Civ. P. 8(a)(2). To meet this standard, a party must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A claim will be considered "plausible on its face" when a plaintiff sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." A*shcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 12(b)(6) allows parties to challenge the sufficiency of a complaint under the foregoing standards. In considering whether a complaint fails to state a claim upon which relief can be granted, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. Thus, while a court is to afford plaintiff every inference, the pleading

must still contain facts sufficient to "provide a plausible basis for the claims in the complaint;" a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *Flex Homes, Inc. v. Ritz-Craft Corp of Michigan, Inc.*, 491 F. App'x 628, 632 (6th Cir. 2012); *Iqbal*, 556 U.S. at 679.

When faced with a threshold question of whether to apply the *Younger* abstention doctrine as raised by Defendants in this case, a court must first address the *Younger* issue prior to engaging in any analysis on the merits of the case. *Tenet v. Doe*, 544 U.S. 1, 6, n.4 (2005); *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 100, n. 3 (1998).

### III.   DISCUSSION

Defendants FCCS, Anthony Reams, and Morgan Hood have moved to dismiss Plaintiff's Complaint, which alleges seven causes of action against them including: 1) malicious prosecution under Ohio law; 2) conspiracy to violate civil rights under 42 U.S.C. § 1983; 3) *Monell* claim for failure to supervise and train under 42 U.S.C. § 1983; 4) supervisor liability under 42 U.S.C. § 1983; 5) negligent hiring under Ohio law; 6) violation of her Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983; and 7) defamation under Ohio law. Defendants argue that Plaintiff's claims are barred under the *Younger* abstention doctrine. And in the alternative, Defendants argue that Plaintiff has failed to state a federal claim upon which relief may be granted.

**A.**   ***Younger* Abstention**

Defendants argue that *Younger* abstention is appropriate in this case because there are

state criminal cases pending against Plaintiff in both California and Ohio.[1] Under the abstention doctrine announced in *Younger v. Harris*, 401 U.S. 37 (1971), when state proceedings are pending, principles of federalism dictate that the constitutional claims should be raised and decided in state court without interference by the federal courts. *See Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 17 (1987). Three requirements must be met for *Younger* abstention to be appropriate: (1) there must be an ongoing state judicial proceeding; (2) the proceeding must implicate important state interests; and (3) there must be an adequate opportunity in the state proceeding to raise constitutional challenges. *Middlesex Cnty Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982); *Tindall v. Wayne Cnty Friend of the Court*, 269 F.3d 533, 538 (6th Cir. 2001); *Kelm v. Hyatt*, 44 F.3d 415, 419 (6th Cir. 1995). If these three criteria are met, "so long as there is no showing of bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate, the federal courts should abstain." *Am. Family Prepaid Legal Corp. v. Columbus Bar Ass'n*, 498 F.3d 328, 332–33 (6th Cir. 2007) (quoting *Squire v. Coughlan*, 469 F.3d 551, 555 (6th Cir. 2006) (quoting *Middlesex Cnty. Ethics Comm.*, 457 U.S. at 435)). The Court will consider each factor in turn.

### 1. Ongoing state judicial proceeding

With respect to the first factor, whether a state proceeding is ongoing is determined at the time the federal complaint is filed. *See Zalman v. Armstrong*, 802 F.2d 199, 201–02 (6th Cir. 1986). Plaintiff specifically states in her Complaint that there are criminal cases pending against

---

[1] At the time Plaintiff filed this case in January 2015, she admits that there are state criminal cases in both California and Ohio pending against her. (*See* Doc. 1, Compl. ¶ 106). There has been no update with respect to the state criminal charges, therefore, the Court assumes they remain pending.

11

her in both Ohio and California.  She stated that "as of the date this complaint was filed, the charges against plaintiff are still pending.  Also still pending against plaintiff are the felony child abduction charges in California."  (Doc. 1, Compl. ¶ 106).

When faced with Defendants' Motion to Dismiss, Plaintiff now argues that the Franklin County case is inactive and therefore not currently pending.  She has provided the docket sheet from the Clerk of Courts which states the case is "inactive."  She describes that the most recent docket entry was a demand for discovery filed December 22, 2014.  (Doc. 12, Pl.'s Memo. Contra at 4, Ex. A).  Defendants argue, and the Court agrees, that there is no explanation as to what inactive means, nor does it state the date on the docket sheet.  Regardless, there has not been a final resolution of the case, at least as of the filing of these briefs.  Further, at the time Plaintiff filed her Complaint, she specifically stated that the Franklin County case and the California criminal proceeding were still pending against her.  Therefore, Defendants have satisfied the first requirement for the application of *Younger* abstention.

### 2.     **Implicate important state interests**

A state has an important interest in "enforcing [its] laws against socially harmful conduct that the State believed in good faith to be punishable under its laws and the Constitution." *Younger*, 401 U.S. at 52.  In this case, the State of Ohio has an important interest in enforcing its laws intended to keep the public safe, particularly juveniles like Chelsia.[2]  The State has pursued this interest by filing charges against Plaintiff in Franklin County.  Therefore, the second requirement of the *Younger* abstention analysis is satisfied.

---

[2] The Court is not giving any weight to the actual charges filed against Plaintiff, only noting that the State has an interest in enforcing its laws.

### 3. Adequate opportunity to raise any constitutional issues

To satisfy the third requirement of *Younger* abstention, the pending state criminal proceedings must provide Plaintiff with an adequate opportunity to raise her federal constitutional claims. "Abstention is appropriate unless the state law *clearly bars* the interposition of the constitutional claims" and it is Plaintiff's burden to show that she is barred from presenting her constitutional claims. *Am. Family Prepaid Legal Corp.*, 498 F.3d at 334 (emphasis in original).

Plaintiff argues that she has not been given an opportunity to raise the constitutional issues in her defense of the criminal proceeding in Franklin County because it is being heard in juvenile court and "the criminal rules and rules of evidence either do not apply, or they are only loosely applied, which results in the deprivation of all the due process safeguards that are couched within those rules of procedure." (Doc. 12, Pl.'s Memo. Contra at 4). Plaintiff also argues that she has been unable to raise any constitutional issues in her defense "because the juvenile court has refused to consider them unless Pamela enters an appearance and a formal plea, thereby waiving service, and waiving all jurisdictional arguments." (*Id.*).

Defendants argue, and the Court agrees, that Plaintiff has failed to demonstrate how she has been barred from asserting her constitutional defenses in the underlying criminal action. (Doc. 10, Defs.' Mot. at 9; Doc. 13, Defs.' Reply at 5). Defendants assert that both the Ohio Rules of Criminal Procedure and the Ohio Rules of Evidence apply in criminal cases brought in juvenile court to the same extent as criminal cases brought in other Ohio courts. (Doc. 13, Defs.' Reply at 6, citing Ohio Crim. R. 1(A) and (C)("These rules proscribe the procedure to be followed in all courts of this state in the exercises of criminal jurisdiction . . ."; there is no

13

exception for criminal actions for violation of O.R.C. 2919.23(B) in Crim. R. 1(C)).  Plaintiff has not submitted any laws or rules contrary to the aforementioned to support her general assertion that she cannot raise her constitutional defenses in juvenile court.  The Court must presume that the state courts are able to protect the interests of a federal plaintiff.  *See Penzoil Co.*, 481 U.S. at 15; *see also Meyers v. Franklin Cnty. Court of Common Pleas*, 23 Fed. App'x. 201, 205 (6th Cir. 2001) (determining that *Younger* abstention applied in a case in which an Ohio juvenile court was the state forum for the proceedings and noting that "[c]ase law demonstrates that parties can generally raise constitutional challenges to statutes and procedures as a defense to neglect proceedings").

Further, Plaintiff suggests that her due process has somehow been denied because she was not permitted to appeal the decision denying her motion to dismiss.  However, the appellate court merely dismissed the appeal because Plaintiff must obtain a final appealable order prior to filing an appeal, which is a requirement in all cases coming from all Ohio trial courts.  Accordingly, Plaintiff has failed to establish that she is barred from raising her constitutional defenses in the underlying pending criminal actions.  The Court finds that the three prongs of the *Younger* abstention doctrine are met and therefore the Court must abstain from exercising jurisdiction over this case at this time.

**B.     Exceptions to Younger Abstention Doctrine**

The United States Supreme Court has held that if the three criteria for Younger abstention are met, the Court must abstain from hearing the case unless the plaintiff can show that one of the following exceptions to *Younger* applies: (1) where irreparable injury is both "great and immediate," *Younger*, 401 U.S. at 46; (2) where the state law is "flagrantly and

patently violative of express constitutional provisions," *Id.* at 53; and (3) where there is a showing of "bad faith, harassment, or other unusual circumstances that would call for equitable relief." *Id.* at 46, 53–54. These exceptions, however, are rarely applied. According to one commentator: "[a]lthough later Supreme Court decisions have not shed a great deal of additional light on the exceptions to *Younger*, what the Court has done confirms that the Court is right when it describes them as 'these narrow exceptions.'" 17 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4255 (1978 & Supp. 1986). In *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 626 (1986), the Supreme Court reemphasized the rarity of these exceptions, noting that *Younger* applies "except in the very unusual situation that an injunction is necessary to prevent great and immediate irreparable injury." The Sixth Circuit held in *Tindall*, 269 F.3d at 539, that:

> Although the Supreme Court has recognized that bad-faith prosecution of an individual may serve as a proper exception to the *Younger* abstention doctrine, see, e.g., *Middlesex County Ethics Comm.*, 457 U.S. at 435, we have found no Supreme Court case that has ever authorized federal intervention under this exception. Such cases are exceedingly rare, particularly where a plaintiff seeking to defeat an abstention argument has failed to avail himself first of state appellate processes before seeking relief in federal court[.]

Plaintiff argues that the repeated filing of the criminal complaint against her in Franklin County clearly demonstrates bad faith by the Defendants. Each time the charges were dismissed, the same complaint was refiled. Plaintiff argues that there is no other explanation other than to harass her. (Doc. 12, Pl.'s Memo. Contra at 5). Defendants respond that the complaints were filed in good faith and allege sufficient facts to establish probable cause the Plaintiff committed the offense charged. Further, Defendants admit they encountered service issues which resulted in prior dismissals. (Doc. 13, Defs.' Reply at 7).

15

Examples of cases where the bad faith or harassment exception was applied include *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82 (5th Cir. 1992) (The bad faith exception to *Younger* was applied because officers with the police repeatedly engaged in searches and seizures which they knew to be unlawful and beyond the scope of statutory authority); and *Video Store, Inc. v. Holcomb*, 729 F. Supp. 579, 580 (S.D. Ohio 1990) (Rubin, J.) (A Southern District of Ohio case in which the county prosecutors filed twelve separate actions against the federal plaintiffs in order to harass the plaintiffs and drain them of all of their financial resources).

The Court is deeply concerned by the actions of the Defendants in this case when it appears that Plaintiff and her family were a positive influence on the Coons children. The multiple filings of the same complaint against Plaintiff is also concerning, however, the Court does not find that it rises to the level of egregious bad faith or harassment required for an exception to *Younger* abstention. Accordingly, the Court finds that Plaintiffs' claims in this case are barred by *Younger* abstention.

**C.     Dismissal or Stay of Action**

The Sixth Circuit has held that when *Younger* abstention is proper and when the federal plaintiff is seeking damages, the district court should stay, not dismiss, the complaint. *See Carroll v. City of Mount Clemens*, 139 F. 3d 1072 (6th Cir. 1997). The Sixth Circuit reasoned that the stay was necessary "to protect against the possibility that [the plaintiff] could be deprived of the opportunity to present the merits of her damages claims in state court." *Id.* at 1076. The Court continued that in the event plaintiff's claims were not barred by res judicata, she "would not have to contend with a statute of limitations defense and various tolling arguments upon the filing of a new federal lawsuit." *Id.*

16

Plaintiff in this case is seeking compensatory and punitive damages, as well as injunctive relief. Therefore, the Court finds that this case should be stayed pending resolution of the underlying state court proceedings. The parties are instructed to file a notice with this Court upon the final resolution of the state court proceedings.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss, but stays this case rather than dismissing it.

The Clerk of this Court shall remove Document 10 from the Court's pending motions list and stay this proceeding until further notice by the parties.

**IT IS SO ORDERED.**

                                        */s/ George C. Smith*
                                        **GEORGE C. SMITH, JUDGE**
                                        **UNITED STATES DISTRICT COURT**